Anna FRIEDMAN, Plaintiff,

v.

ITC INTERNATIONAL TELEVISION CORPORATION, Mobil Corporation, Channel 13, Public Broadcasting Channel, Defendants.

No. CV–83–3015.

United States District Court, E.D. New York.

March 11, 1986.

## MEMORANDUM OF DECISION AND ORDER

COSTANTINO, District Judge.

Defendants move this court for summary judgment.

### FACTS

Plaintiff is the author and the owner of a copyright in a work entitled *Benjamin Disraeli.*

Plaintiff alleges that defendants' television broadcast entitled *Disraeli: Portrait of a Romantic,* shown on public television, infringed upon her copyright.

For purposes of this motion, all parties concede that defendants had access to plaintiff's manuscript.

### Plaintiff's Claim of Similarity

Plaintiff's biography of Disraeli is an essentially chronological account of the life of the famed British statesman. The manuscript chronicles Disraeli's life from his birth through his rise to political power. The last 15 pages of the manuscript contains plaintiff's conclusions with respect to the place in history occupied by Disraeli.

Plaintiff's affidavit in opposition states that she was astonished at the "striking similarity" between her work and defendants' teleplay.

Plaintiff, to aid the court in its inquiry on this motion, made notes in the margins of defendants' transcript of the teleplay detailing the alleged similarities.

The court has reviewed both works in question as well as the alleged similarities and finds, *inter alia,* that plaintiff claims copyright protection over the following:

1. Disraeli's date of birth and lineage
2. Disraeli's academic difficulties
3. Disraeli's travels
4. Disraeli's wardrobe

5. Clara's acquaintance with Disraeli
6. Mary Anne's having read Disraeli's books
7. Disraeli's need to write books in order to satisfy creditors
8. Disraeli's desire to confront O'Connell with a challenge to duel.

### Defendants' Dissimilarity

Defendants argue that every similarity to which plaintiff points involves an historical fact, idea or *scene a faire*, and it is apparent to the court that plaintiff nowhere denies this.

Defendants categorically state that plaintiff seeks to appropriate to herself the exclusive right to recount the life of an historical figure in chronological order.

### DISCUSSION

■ It is undisputed that plaintiff has a valid copyright in her book. To prove infringement, she must also show copying by defendants. *Warner Brothers v. American Broadcasting Co.*, 654 F.2d 204, 207 (2d Cir.1981) (*Warner I*). Copying may be inferred where a plaintiff establishes that the defendant had access to the copyrighted work and that substantial similarities exist as to protectible material in the two works. *Reyher v. Children's Television Workshop*, 533 F.2d 87, 90 (2d Cir.), *cert. denied*, 429 U.S. 980, 97 S.Ct. 492, 50 L.Ed.2d 588 (1976). There is no question in this case whether defendants had access to plaintiff's work as it is conceded that they

did. Accordingly, in determining whether substantial similarity between the works exists, "the court must distill the protected parts of a work from the unprotected." *Warner Brothers, Inc. v. American Broadcasting Co.*, 530 F.Supp. 1187, 1190 (S.D.N.Y.1982), *aff'd*, 720 F.2d 231 (2d Cir. 1983) (*Warner II*).

This court has the authority to determine noninfringement as a matter of law on a motion for summary judgment either when the similarity concerns only noncopyrightable elements of plaintiff's work, or when no reasonable trier of fact could find the works substantially similar. *Warner Brothers, Inc. v. American Broadcasting Co.*, 720 F.2d at 240 (1983) (*Warner II*).

■ This court finds that there is a substantial *dissimilarity* in perspective between the two works. Plaintiff's work, as she states in her affidavit, is a product of her research in the New York Public Library. The manuscript essentially restates the "newsclippings and reports of the times as well as accounts of Disraeli's contemporaries." It is apparent to the court that much of the language in her plaintiff's manuscript is not a product of 20th Century American English, whereas, defendants' teleplay is clearly a product of 20th Century American English. In fact, much of the language used in plaintiff's manuscript is rather archaic.[1]

Moreover, those passages which plaintiff alleges to be "direct quote[s]" are clearly not.[2]

1. *See, e.g.,* at page 25–26.
   The letters are equally characteristic of the man. In his disposition (sic). If their tone is occassionally (sic) caustic and cynical it has been assumed more in the way of frolic and banter than in sober earnestness. That love of flashy and fantastic dress which he always possessed and which is not rare in his race although he may have indulged in it partly in immitation (sic) of Byron is constantly peeping out. At he excites (sic) the admiration of the dandies by wearing some studs which his mother had given him by possessing two canes (sic) it was then the fashion for fine gentlemen to carry a cane at all times one of which he used in the morning exchanging it for another at gun fire; and he heard with dismay of the King's

death, as it was the destruction of two richly embroidered dress waistcoats which he could no longer wear.
   The foregoing is alleged to be infringed upon by the following narrative at page 3 of the teleplay:
   He went through Spain, Greece, Albania, Egypt, Jerusalem, and everywhere he went, he added some article of native dress to his costume. Everywhere he astonished the natives.

2. *See* plaintiff's manuscript at 36:
   In 1832 Mr. Thomas Baring having been raised to the peerage, the seat in Parliament, which he held as member for High Wycombe, became vacant. Disraeli, anticipating the event had entered into communication with persons of some influence in the borough with a view to

■ The conclusion is inescapable that no reasonable observer could find them substantially similar beyond the level of generalized or otherwise nonprotectible ideas. Plaintiff's book, by plaintiff's own description, is an account of actual events. This renders proof of infringement more difficult, because copyright protection in this circuit does not extend to facts or to true events, even if they are discovered through original research. *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 49 (2d Cir. 1986).

Accordingly, defendants' motion for summary judgment is granted.

SO ORDERED.

offering himself as a candidate for its representation. His family had already come connection (sic) with the county of Buckinghamshire, as his father had lived for several summers at Hyde Hall, near Chesham a house belonging to his friend Plumer Ward. On the 10th of June he wrote to Mr. Austen. He had to please, he said all parties Whigs, Tories and Radicals (sic) Quakers, Evangelists, Abolition of Slavery, Reform Conservatism, Corn Laws, and he feared that he might compromise himself with the ten pounders; but he was sanguine of success, although he had at his opponnent so formidable a personage as Colonel Grey the son of the prime minister.

The portico of the Red Lion which was adorned with a wooden image of that noble animal ...

Compare with the transcript of the teleplay at page 19, which plaintiff alleges to be a direct quote:

*Scene 6. Ext. Portico. Red Lion Inn. Night* A *crowd* of men and women stand in Wycomb High Street looking up at the low, stone portico over the entrance to the Red Lion Inn, with its larger than life-size statue of a red lion. They are listening to *Disraeli* who is in full flood, standing up on the portico beside the statue.